**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gordon Peppers, *et al.*, | No. CV-21-08090-PCT-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| Scott Mascher, *et al.*, | |
| Defendants. | |

At issue is Defendant Wexford Health Sources' Motion for Summary Judgment (Doc. 94, Wexford MSJ) supported by a Statement of Facts (Doc. 95, Wexford SOF), to which Plaintiffs Gordon Peppers and Christopher Tinsley filed a Response (Doc. 103, Resp. to Wexford MSJ) supported by a Statement of Facts (Doc. 104, PSOF1), and Wexford filed a Reply (Doc. 110, Wexford Reply). Also at issue is Defendants Yavapai County, Sheriff Scott Mascher, Deputy Trevor Hearl, Sergeant Jarrod Winfrey, and Deputy Travis Hartman's (collectively, "Yavapai County Defendants") Motion for Summary Judgment (Doc. 96, Yavapai Cnty. MSJ) supported by a Statement of Facts (Doc. 97, Yavapai Cnty. SOF), to which Plaintiffs filed a Response (Doc. 105, Resp. to Yavapai Cnty. MSJ) supported by a Statement of Facts (Doc. 106, PSOF2), and the Yavapai County Defendants filed a Reply (Doc. 111, Yavapai Cnty. Reply). The Court will resolve the Motions for Summary Judgment without oral argument. LRCiv 7.2(f).

I.      BACKGROUND

On March 24, 2020, Plaintiffs Gordon Peppers and Christopher Tinsley, who are African American, left Oregon driving a van containing a shipment of what they claim was hemp with the intention of delivering it to buyers in Texas, Paul Wiggins and Desarea Murray. (PSOF2 ¶¶ 5, 27.) The next day, while Plaintiffs were traveling eastbound on I-40 through Arizona, Defendant Yavapai County Sheriff's Deputy Trevor Hearl "noticed the vehicle drift from centered in its lane toward the shoulder, hugging the fog line." (PSOF2 Ex. C, Incident Report at 3.) Deputy Hearl also "noticed the vehicle did not have a permanent license plate displayed," and he "could not make out the numbers" of the temporary tag in the rear window because the "tint was too dark." (Incident Report at 4.) He observed that the van was traveling below the posted speed limit and, as he passed the van, "the driver appeared to be extremely nervous[; he] was pushed back in his seat, with both hands on the steering wheel and both arms locked out," which Deputy Hearl noted is "not typical behavior displayed by the innocent motoring public while traveling long distances on the highway." (Incident Report at 4.) Based on these observations, Deputy Hearl conducted a traffic stop of Plaintiffs. (Yavapai Cnty. SOF ¶ 19.)

Deputy Hearl's body camera footage reveals that he approached the passenger side window of the vehicle, which Peppers opened, and Deputy Hearl said, "Hey, how we doing guys? License, registration, proof of insurance please." (PSOF2 Ex. D, Body Cam Video at 14:57:49–53.) Plaintiffs contend that "Defendant Hearl's stated reasons for stopping the vehicle were that the van had drifted towards the fog line, that the van was driving *below* the speed limit, and the driver of the van looked uncomfortable." (Resp. to Yavapai Cnty. MSJ at 3; PSOF2 ¶ 10.) While those reasons are listed in the Incident Report, upon stopping them, Deputy Hearl stated to Plaintiffs that he stopped them because "the way your temp tag is displayed, it's not displayed properly, you can't see it because of the tint." (Body Cam Video at 14:58:04–09.) Peppers replied, "That's how they do it in Oregon. It's a company car." (Body Cam Video at 14:58:09–14.) Deputy Hearl asked, "Are you guys

delivering something or what," to which Peppers responded in the affirmative. (Body Cam Video at 14:58:26–29.)

Deputy Hearl asked if Plaintiffs had a bill of lading, and Peppers gave him a driver's license and Certificates of Analysis ("COAs") for cannabinoids. (Body Cam Video at 14:58:35; Yavapai Cnty. SOF ¶ 24.) Meanwhile, Tinsley, who had been driving, searched his backpack for a driver's license and then stated he did not have it with him. (Body Cam Video at 14:58:54.) Peppers said, "he does have a valid license." (Body Cam Video at 14:59:08.)

Deputy Hearl asked Tinsley to come back to his patrol car parked behind the van so that he could run Tinsley's information. (Body Cam Video at 14:59:14; Yavapai Cnty. SOF ¶¶ 29–30.) In the patrol car, Deputy Hearl radioed for assistance from his supervisor, Sergeant Eric Lopez, and ran a search for an Oregon driver's license based on the information Tinsley gave him, which resulted in no return. (Body Cam Video at 15:00:10, 15:01:40; Yavapai Cnty. SOF ¶ 30.) In the meantime, Tinsley noted, "you can't really see that, can you," and Deputy Hearl said, "no you can't" but "I'm not going to ticket you for it." (Body Cam Video at 15:02:30.) Deputy Hearl asked Tinsley if his license was suspended right now, and Tinsley said, "No, no, no, no, shouldn't be."[1] (Body Cam Video at 15:04:41; Yavapai Cnty. SOF ¶ 30.)

Deputy Hearl asked Tinsley where the shipment was going, and Tinsley said he could not remember what part of Texas. (Body Cam Video at 15:00:30; Yavapai Cnty. SOF ¶ 32.) Tinsley stated that he and Peppers work for Northwest Pure Greens, and their role was to "basically deliver." (Body Cam Video at 15:01:05, 15:01:25; Yavapai Cnty. SOF ¶ 32.) Tinsley said they had been working for Northwest Pure Greens for a couple months. (Body Cam Video at 15:03:30; Yavapai Cnty. SOF ¶ 32.) Deputy Hearl indicated he did not know how the transport of hemp works in Arizona and would ask his supervisor when he arrived. (Body Cam Video at 15:02:58; Yavapai Cnty. SOF ¶¶ 29–30.)

---

[1] A later search revealed Tinsley's driver's license was in his backpack and the license was suspended. (Yavapai Cnty. SOF ¶ 30.)

Shortly thereafter, Sergeant Lopez arrived to assist. Deputy Hearl explained to Tinsley that he works for a narcotics task force and they had been seeing a lot of "cover loads," so they had to investigate the shipment. (Body Cam Video at 15:06:35.) Deputy Hearl and Sergeant Lopez examined the COAs, and Peppers explained the technical difference between hemp and marijuana. (Body Cam Video at 15:08:30.) Deputy Hearl asked if they could see some of the product, and Peppers retrieved a bag of the product to show them. (Body Cam Video at 15:09:59.) Sergeant Lopez believed the product looked like "bud," or marijuana, and Peppers insisted it was hemp. (Body Cam Video at 15:11:17.) The body camera footage also reveals Defendant Deputy Travis Hartman arrived to assist along with two other officers, Deputy Gresham and Prescott Police Officer Reynolds. (Body Cam Video at 15:11:35.) The two packages of product they looked at were labeled as the strains "bubba kush" and "serva haze." (Body Cam Video at 15:13:20, 15:17:33.) The officers commented that the product was packaged haphazardly and looked the same as marijuana, and they could not tell the difference between the product and marijuana.[2] (Body Cam Video at 15:17:40.)

Defendant Sergeant Jarrod Winfrey, who was not on the scene, received photos of the COAs from Sergeant Lopez during the traffic stop and investigated them. (Yavapai Cnty. SOF Ex. D, Winfrey Aff. ¶¶ 3–15.) Sergeant Winfrey noted that the client name on one COA was Sacred Flower Farms, which a search revealed was "a marijuana grower in Oregon that sells many different kinds of marijuana for recreational use," and the Oregon

---

[2] Both the Incident Report and Deputy Hearl's Affidavit state that Sergeant Lopez "began making phone calls to assist in identifying the shipment," before concluding the load was unlikely to be legitimate hemp. In so doing, both the Incident Report and Hearl's Affidavit state, "See [Lopez's] supplement for further information." (Incident Report at 5; Yavapai Cnty. SOF Ex. C, Hearl Aff. ¶¶ 39–40.) Neither the Incident Report included in Plaintiffs' evidence, nor the Hearl Affidavit included in Yavapai County's evidence, contain the referred-to Lopez supplement. Indeed, Plaintiffs submitted only the first seven pages of the 16-page Incident Report, so the Court does not have the information in the rest of the Incident Report (presumably including the Lopez supplement) to consider in resolving Yavapai County's Motion for Summary Judgment. But without controverting evidence, the Court can only conclude that the information Sergeant Lopez received—from calls he apparently made after the officers turned off their body cameras—helped lead him to the conclusion that the van's load was unlikely to be legitimate hemp, as Deputy Hearl reported in the Incident Report. Indeed, Sergeant Jarrod Winfrey's Affidavit indicates he was in contact with Sergeant Lopez and providing him information about the COAs.

address listed was for "an empty lot for sale on Homes.com." (Winfrey Aff. ¶¶ 10, 12.) The phone number listed was for a real estate agent in The Woodlands, Texas. (Winfrey Aff. ¶ 13.) Sergeant Winfrey also noted that: the paperwork was the same as paperwork he could print off the internet with the same lab personnel and the same signature at the bottom; many of the documents attached to packages were identical copies of documents attached to different packages; and the paperwork actually covered only some of the items located in the van. (Winfrey Aff. ¶¶ 16, 48, 78.) Considering the totality of the circumstances, including "[t]he method of packaging and the inconsistent documentation, along with the appearance of the load of marijuana," Winfrey concluded there was probable cause to "seize the suspects." (Yavapai Cnty. SOF ¶ 42; Winfrey Aff. ¶ 16.)

Plaintiffs and the van were transported to Yavapai County Sheriff's Office Property and Evidence Building for investigation, and Yavapai County Judge Hancock signed a search warrant for Plaintiffs' phones. (Yavapai Cnty. SOF ¶¶ 43–44.) In interviews, Plaintiffs both stated that they had been hired by the buyers to transport the product, and the van was recently purchased and provided by a woman named Augusta, the Texas buyer's sister. (Yavapai Cnty. SOF ¶¶ 47, 53; Winfrey Aff. ¶ 32.) Their phones revealed worried text messages from Augusta every few hours during the 24-hour-a-day drive, including "whoever's not driving needs to be the eyes for the driver," "make sure you get an ashtray and don't throw anything out the window," and "check the temp tag every time you get out of the vehicle." (Yavapai Cnty. SOF ¶ 47; Winfrey Aff. ¶¶ 36–38.) Peppers's cell phone contained messages from Wiggins, the Texas buyer, stating that another driver and acquaintance of Peppers, James Kelsay, was arrested in Navajo County for marijuana smuggling and Wiggins was "sick to his stomach" about that. (Winfrey Aff. ¶¶ 54–56.) Peppers's cell phone also revealed that he had shipped "pounds of marijuana out to people using fake names and addresses," which Peppers said he had not done for at least six months because he had changed his ways now that he had custody of his granddaughter. (Winfrey Aff. ¶¶ 62–63.) When Sergeant Winfrey told Peppers that many of the COAs Wiggins had provided him did not match the labels on the products themselves and many

COAs were copies of the same page, Peppers replied, "He fucking played me." (Winfrey Aff. ¶¶ 77–78.)

Plaintiffs were booked into Yavapai County Jail in Prescott. (Yavapai Cnty. SOF ¶ 55.) On March 30, 2020, Deputy County Attorney Mike Morrison filed charges against Plaintiffs for knowingly transporting for sale or importing into Arizona an amount of marijuana having a weight more than two pounds. (Yavapai Cnty. SOF ¶ 56.)

The van contained 23 totes totaling 417 pounds of product, including product labeled bubba, silver haze, bubba haze, super sour candy, bubba kush, sour space candy, and serva haze. (Yavapai Cnty. SOF ¶ 50; Winfrey Aff. ¶ 127.) A Google search on Allbud.com revealed a THC potency of 14–27% for these types of marijuana, where hemp may only contain up to 0.3% THC. (Yavapai Cnty. SOF ¶ 57; Winfrey Aff. ¶ 116.)

Sergeant Winfrey called Portland Police Department Officer Scott Groshong to discuss the case. (Winfrey Aff. ¶ 117.) Augusta Wiggins, the buyer's sister, had attempted to ship the product from Oregon to Florida by way of Reddaway Trucking in Oregon, but that company refused, and Augusta Wiggins obtained a van for the shipment, with a destination not of Florida but of Texas. (Winfrey Aff. ¶¶ 118–23.) Officer Groshong stated he had not seen industrial hemp packaged in individual bags before, as this shipment was, and "the property inspected as being hemp did not have the high-quality look to it that they were used to." (Winfrey Aff. ¶¶ 123–25.)

Samples of each product were sent to a laboratory in Phoenix for testing, and five of the seven samples had a THC content over the legal limit for hemp, from 0.31% to 0.37%. (Yavapai Cnty. SOF ¶ 57.) "Based on the findings, with the legal limit for THC being .3% and regular marijuana used for recreational use having a THC content usually anywhere from 6% – 45%," Sergeant Winfrey concluded that "it appears that the people transporting the marijuana, which was outside the legal limits and not within the parameters presented on the partial paperwork, were attempting to transport a product they could have believed to be legal." (Winfrey Aff. ¶ 139.) On Sergeant Winfrey's recommendation, Plaintiffs were released eight days after they had been detained, and the Yavapai County

Attorney's Office dropped the charges against Plaintiffs and filed a Motion to Dismiss on April 9, 2020. (PSOF2 ¶ 48; Winfrey Aff. ¶ 142.)

On March 25, 2020—the day of the arrest—Peppers took several medications he possessed in the presence of officers, including Gabapentin, Metformin, Amlodipine, Omeprazole, and "baby aspirin or Ibuprofen." (Wexford SOF ¶ 1.) The next day, he underwent a medical screening in which he reported taking Ibuprofen, Gabapentin and Hydrocodone for back pain, Metformin for diabetes, Amlodipine for hypertension, Atorvastatin for high cholesterol, and Omeprazole and Ranitidine for GERD; he also used an inhaler for asthma and reported using tobacco and marijuana. (Wexford SOF ¶¶ 2–4.) Peppers had a 97% oxygen saturation at intake. (Wexford SOF ¶ 5.) His finger stick glucose reading was within the normal limits at 141, as were two more readings the next day. (Wexford SOF ¶¶ 5–7.) The representative of Defendant Wexford—the jail's medical care provider—informed Peppers it had to "confirm the doses of his meds which he could not provide and that records were being requested from his pharmacy in Oregon." (Wexford SOF ¶ 8.)

During his eight days of detention, Wexford provided Peppers with 14 doses of Ibuprofen for his back pain, batteries for his hearing aids, a Levalbuterol MDI inhaler, seven doses of Simvastatin for high cholesterol, seven doses of Amlodipine for hypertension, and 13 doses of Metformin for diabetes. (Wexford SOF ¶¶ 13, 20–22.) Medical staff "observed, treated, or examined" Peppers 20 times in the eight days he was in detention. (Wexford SOF ¶ 23.) Wexford did not provide Peppers with the requested diabetic snacks because his daily blood sugar readings were within normal limits. (Wexford SOF ¶¶ 14, 18.) Wexford also refused Peppers's request for Gabapentin, Lyrica, and hydrocodone, because Gabapentin is a psychotropic, Lyrica is "too expensive," and hydrocodone is a narcotic; Wexford provided Ibuprofen instead. (Wexford SOF ¶ 17; PSOF1 ¶ 12.)

Peppers later reported that he "struggled to breath[e] for a period of four (4) days" in the absence of his inhaler, that he "suffered from blurred vision, light-headedness, and

dizziness" from being denied a diabetic snack, and he "suffered severe pain in his back" after being refused Gabapentin and Lyrica. (PSOF1 ¶¶ 16–18.) Wexford's expert, Dr. Alfred A. Joshua, opined that "Plaintiff was appropriately treated for his asthma because he had a normal oxygen saturation at intake [and] there was no evidence that he suffered an asthma exacerbation or needed to be sent out for additional treatment between intake and March 27, 2020, when he received an inhaler for his asthma." (Wexford SOF ¶ 38.) Dr. Joshua further opined that Plaintiff "was appropriately treated for his Type II Diabetes, as his repeated blood sugars during his incarceration were 'all within normal limits,' and the medication he had been prescribed to address his diabetes—Metformin—is not known to cause hypoglycemia, meaning there was no clinical indication for a snack to be provided to Peppers." (Wexford SOF ¶ 36.) Finally, Dr. Joshua stated, "[a]lthough Peppers claims significant pain and impairment from his chronic back pain, that had to be viewed with his functional ability to drive long distances, over multiple days, in a seated position," and "it is unlikely that Peppers could have been on the Gabapentin and Hydrocodone while driving because it would likely impair his ability to drive." (Wexford SOF ¶¶ 40–41.) Likewise, "there is no evidence that Peppers had any symptoms of withdrawal from Gabapentin or Hydrocodone during his detention."[3] (Wexford SOF ¶ 42.)

Plaintiffs filed this lawsuit on April 30, 2021 (Doc. 1), and in the Third Amended Complaint—the operative pleading—Plaintiffs raise four claims against Defendants: (1) a 42 U.S.C. § 1983 claim for violation of the Fourth Amendment protection against unreasonable searches and seizures; (2) a § 1983 claim for violation of the Fourteenth Amendment right to Equal Protection; (3) a false imprisonment/false arrest claim under Arizona state law; and (4) a § 1983 claim for violation of the Eighth Amendment for deliberate indifference to serious medical needs. (Doc. 79, Third Am. Compl. ("TAC") ¶¶ 61–103.) Defendants now move for summary judgment on all the claims against them.

---

[3] Peppers did not disclose a medical expert witness or any expert opinions as to his medical care in this case, nor did he take the testimony of any representative of Wexford. (Wexford SOF ¶¶ 25–26.)

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 232. When the moving party does not bear the ultimate burden of proof, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party carries this initial burden of production, the nonmoving party must produce evidence to support its claim or defense. *Id.* at 1103. Summary judgment is appropriate against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence, as long as it is supported by affidavits or other evidentiary material. *Anderson*, 477 U.S. at 255. However, the non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Id.* at 256–57

(holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." (citation omitted)).

## III.   ANALYSIS

### A.   Claims Against the Yavapai County Defendants

#### 1.   Qualified Immunity

Section 1983 grants every person a right of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. However, § 1983 is "not itself a source of substantive rights." *Sampson v. Cty. of L.A. by & through L.A. Cty. Dep't of Child. & Fam. Servs.*, 974 F.3d 1012, 1018 (9th Cir. 2020). To state a § 1983 claim, Plaintiff "must allege the violation of a right secured by the Constitution and laws of the United States" committed by "a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

A state government employee alleged to have committed a § 1983 violation is protected from liability by qualified immunity unless his/her conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining whether qualified immunity applies, the court looks at (1) whether the plaintiff has sufficiently demonstrated a violation of a constitutional right, and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

#### a.   Probable Cause for Arrest

The Fourth Amendment requires that an arrest be supported by probable cause. Michigan v. Summers, 452 U.S. 692, 700 (1981). "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." United States v. Lopez, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing Beck v.

Ohio, 379 U.S. 89, 91 (1964)). Alternatively, probable cause exists when, "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the arrestees] had committed a crime." Id. (citing United States v. Smith, 790 F.2d 789, 792 (9th Cir. 1986)). Though conclusive evidence of guilt is not required, "[m]ere suspicion, common rumor, or even strong reason to suspect are not enough." Id. (citing McKenzie v. Lamb, 738 F.2d 1005, 1008 (9th Cir. 1984)).

"Probable cause is an objective standard," and "[t]he arresting officers' subjective intention . . . is immaterial in judging whether their actions were reasonable for Fourth Amendment purposes." Id. Where officers act in concert, the Court must "look[ ] to the collective knowledge of all the officers involved in the criminal investigation." United States v. Fowlkes, 804 F.3d 954, 971 (9th Cir. 2015). The Court's examination of probable cause is not impacted by the fact that the arrestee may ultimately be acquitted, but rather is dependent on the arresting officer's knowledge at the time of the arrest. See Devenpeck v. Alford, 543 U.S. 146, 152 (2004); Beauregard v. Wingard, 362 F.2d 901, 903 (9th Cir. 1966).

Though it is "well established" that an arrest without probable cause violates the Fourth Amendment, an officer who makes an arrest without probable cause "may still be entitled to qualified immunity if he reasonably *believed* there to have been probable cause." *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 (9th Cir. 2011) (emphasis in original). "In the context of an unlawful arrest, then, the two prongs of the qualified immunity analysis can be summarized as: (1) whether there was probable cause for the arrest; and (2) whether it is *reasonably arguable* that there was probable cause for the arrest—that is, whether reasonable officers could disagree as to the legality of the arrest." *Id.* (emphasis in original).

In relevant part, the Yavapai County Defendants charged Plaintiffs with violation of A.R.S. § 13-3405(A)(4), which criminalizes an individual's import or transport for sale of marijuana into Arizona, except for personal use as provided in A.R.S. § 36-2852. Plaintiffs argue that the Yavapai County Defendants lacked probable cause to arrest them because they had paperwork indicating the product they were transporting was hemp and

the buyers and one of the test labs listed on the paperwork made statements to Defendants corroborating Plaintiffs' statements.

The totality of the evidence shows that the officers had probable cause to arrest Plaintiffs, that is, a prudent person would have concluded that there was a fair probability Plaintiffs committed a crime. First, Plaintiffs' statements about being commercial drivers were contradicted by the evidence before the Yavapai County Defendants at the time of the arrest: Tinsley stated to Deputy Hearl that they worked for Northwest Pure Greens, but that was false, and both Plaintiffs later told Sergeant Winfrey the buyers hired them just for this job; Tinsley stated he forgot his driver's license—it turned out to be in his backpack—and he was driving on a suspended license—itself an offense under Arizona law—both of which were inconsistent with the conduct of a professional driver; and Tinsley could not identify their destination in Texas. Second, the COA paperwork was defective and appeared fraudulent: the Oregon address listed was for an empty lot for sale on Homes.com; the telephone number was for a real estate agent in The Woodlands, Texas; Sergeant Winfrey stated he was able to print off the internet the same paperwork with the same test lab personnel and same signature at the bottom; documents attached to certain packages were identical to documents attached to different packages; and the paperwork was incomplete and did not cover all of the products in the load.

Third, the load appeared to be marijuana: both Plaintiffs and the Yavapai County Defendants stated this load of product could not be distinguished from marijuana by looking at or smelling it; the product was labeled as seven different types of marijuana that Allbud.com stated contains 14–27% THC; and the load was packaged haphazardly and unprofessionally, including in plastic bags from the retail store Cabela's. Indeed, when Sergeant Winfrey later spoke with Portland Police Officer Groshong, he stated industrial hemp was not normally packaged in individual bags, as this load was, and the load did not have the high-quality look hemp normally has. Fourth, Plaintiffs' phones revealed information corroborating the probability of marijuana transport: text messages showed an associate of Peppers and the buyer, Wiggins, was recently arrested in Navajo County for

1   the transport of marijuana; text messages showed, and Peppers admitted, he had previously
2   shipped pounds of marijuana to various buyers using fake names and addresses; and the
3   buyer's sister (and provider of the van) had sent Plaintiffs worried text messages every
4   couple hours around the clock since Plaintiffs had left Portland. Lastly, as the Yavapai
5   County Defendants point out, Arizona requires a hemp transporter to have a license, and a
6   person transporting hemp without a license is subject to criminal prosecution. A.R.S.
7   § 3-319(C). Plaintiffs possessed no license for the transport of hemp.

8   Plaintiffs contend that the sloppiness of the shipment paperwork should not have
9   been enough to lead to their arrest. In making such an argument, Plaintiffs appear to
10  minimize the fact that Arizona regulates the transport of controlled substances as a matter
11  of public safety, and because hemp and marijuana look and smell the same, proper
12  paperwork is critical. In any event, as detailed *supra*, the paperwork issues were but some
13  of the facts leading to Plaintiffs' arrest. Deputy Hearl, Sergeant Winfrey, and Deputy
14  Hartman had probable cause to arrest Plaintiffs, and therefore Plaintiffs have not
15  demonstrated a violation of a Fourth Amendment right and these Defendants have qualified
16  immunity from Plaintiffs' associated § 1983 claim.[4] Because Plaintiffs have produced no
17  evidence that Sheriff Scott Mascher in his personal capacity had anything to do with
18  Plaintiffs' arrest, their claim against Sheriff Mascher also fails.

### b. Equal Protection

20  To prove a § 1983 claim alleging a violation of the Equal Protection Clause of the
21  Fourteenth Amendment, Plaintiffs "must show that the defendants acted with an intent or

---

[4] The Yavapai County Defendants also argue the evidence shows that they had reasonable suspicion to conduct a traffic stop of Plaintiffs. A law enforcement officer may stop a driver without violating the Fourth Amendment when the officer has probable cause to believe that a traffic violation has occurred. *See Whren v. United States*, 517 U.S. 806, 810 (1996). Under the Supreme Court's decision in *Whren*, a brief investigative stop is permissible if there is reasonable suspicion to conclude a traffic violation occurred. *Id.* at 818–19; *Navarette v. California*, 572 U.S. 393, 397 (2014) ("Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." (internal citations and quotations omitted)). In their Response (Pls.' Resp. to Yavapai Cnty. MSJ at 5–8), Plaintiffs do not argue or point to evidence to controvert the Yavapai County Defendants' contention that they met the reasonable suspicion standard, and the evidence is uncontroverted that Deputy Hearl had reasonable suspicion to conduct a traffic stop of Plaintiffs.

purpose to discriminate" against them based upon their inclusion in a protected class. *Barren v. Harrington*, 152 F.3d 1193, 1194 (1998). Finding intentional discrimination "requires more than 'intent as volition or intent as awareness of consequences.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

The thrust of Plaintiffs' Equal Protection argument is that the Yavapai County Defendants arrested them without probable cause and in disregard of certain evidence, so the arrest must have been grounded in racial discrimination because Plaintiffs are African-American. As detailed *supra,* the Court disagrees that the Yavapai County Defendants lacked probable cause to arrest Plaintiffs.

The other evidence Plaintiffs point to is a statement Peppers says he heard Sergeant Winfrey make to Peppers's mother. Peppers testified that his mother spoke to Sergeant Winfrey by telephone when Peppers was released from detention about getting his identification and debit card back. Peppers could not hear what his mother said on the other end of the telephone line, but he heard Sergeant Winfrey say, "What do you expect? He is in a redneck county." (PSOF2 Ex. A, Peppers Dep. at 138–39.) Without more, this single statement has no probative value to a finding that the Yavapai County Defendants arrested Plaintiffs not based on probable cause but because they are African-American. Plaintiffs provide no evidence as to what Sergeant Winfrey was responding to in making the statement, and the statement is thus without relevant context in their arrest. And Plaintiffs proffer no evidence that the Yavapai County Defendants harassed or otherwise discriminated against Plaintiffs because of their race. In the absence of an Equal Protection violation, the Yavapai County Defendants are entitled to qualified immunity from Plaintiffs' associated § 1983 claim.

### 2.     State Law Claims

Plaintiffs also bring a common law tort claim against the Yavapai County Defendants for "false imprisonment/false arrest." (TAC ¶¶ 77–88.) The basis of this tort cause of action under Arizona law is an arrest or imprisonment "without lawful authority."

*Cullison v. City of Peoria*, 584 P.2d 1156, 1160 (Ariz. 1978). As in *Cullison*, the Yavapai County Defendants acted with legal authority here because, as detailed *supra*, the record shows they "were at all times material to this action proceeding pursuant to valid legal process and probable cause." *Id.* Thus, Plaintiffs' state law claim of false imprisonment/false arrest also fails. *See id.* at 1161.

### 3. *Monell* Liability

Plaintiffs also raise a § 1983 claim against Yavapai County. In *Monell*, the Supreme Court held that a municipality (or county) is not liable for § 1983 claims under a theory of *respondeat superior*. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978). Instead, a plaintiff must show that the municipality has adopted an "official policy" or "custom" that caused the alleged constitutional violation, "whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to actions for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (quoting *Monell*, 436 U.S. at 694). As Plaintiffs cannot show their Fourth or Fourteenth Amendment rights were violated, the related claim against the County fails as well.

### B. Claims Against Wexford

Peppers next raises a § 1983 claim against Wexford alleging it violated his Eighth Amendment rights by failing to provide adequate medical care to him while he was in detention. To prove such a claim, a plaintiff must show that the defendant acted with "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citation omitted). A medical need is serious if failure to treat it "could result in further significant injury or the unnecessary and wanton infliction of pain." *Id.* To prove the defendant's deliberate indifference, a plaintiff must show "(a) a purposeful act or failure to respond to the plaintiff's pain or possible medical need and (b) harm caused by the indifference." *Id.* "[I]nadvertent or negligent failure to provide adequate medical

care alone does not state a claim under § 1983. *Id.* "A difference of [medical] opinion," without more, "does not amount to a deliberate indifference to [the plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

Assuming Peppers's reported medical needs were serious enough to warrant medical treatment, Peppers has produced insufficient evidence to demonstrate deliberate indifference, that is, evidence from which a trier of fact could reasonably conclude that Wexford purposefully failed to respond to Peppers's medical needs. Because Peppers is not a medical professional, he cannot testify as to the medical necessity of certain treatment; he can only testify as to symptoms and his historical treatment. The only medical evidence Peppers has proffered are two treatment notes from visits to his doctors after his detention. Dr. Robert Arnsdorf, Peppers's back pain doctor, states that Peppers has a prescription for Lyrica and Gabapentin, but Peppers "did not report any symptoms of withdrawal during the period of time he was not on these medications." (PSOF1 Ex. B.) And Dr. Jonathan Lazaro, Peppers's family medicine doctor, states that Peppers is a "diagnosed type 2 diabetic" and "needs a regularly provided consistent carbohydrate diet to help ensure that his blood sugars are in control and that he does not go into hypoglycemia." (PSOF1 Ex. C.)

Neither piece of evidence is sufficient to show Wexford was deliberately indifferent to Peppers's medical needs. Wexford's medical expert, Dr. Joshua, concluded that Peppers was appropriately treated with Ibuprofen for back pain, because Peppers's pain must be measured by his ability to "drive long distances, over multiple days, in a seated position" and the fact that driving after taking Gabapentin and Hydrocodone is impermissible due to the impairment the driver suffers under the influence of those medications. (Wexford SOF ¶¶ 40–41.) Moreover, as his own doctor stated, Peppers did not suffer from withdrawal from these medications. (Wexford SOF ¶ 42.) Peppers has produced no reliable medical evidence that Wexford was deliberately indifferent to his back pain.

With regard to diabetes, Dr. Joshua stated that Wexford appropriately monitored Peppers's blood sugar in detention, and the measurements were always within normal

limits. (Wexford SOF ¶ 36.) In addition, Wexford did administer to Peppers his diabetes medication, Metformin, and Dr. Joshua stated that it is not known to cause hypoglycemia. (Wexford SOF ¶ 36.) Peppers has proffered no reliable medical evidence that he suffered from hypoglycemia while in detention or that Wexford was deliberately indifferent to his diabetes.

And with regard to asthma, for which Peppers has not produced any medical evidence, Dr. Joshua noted that Wexford's measurement of Peppers's oxygen saturation was within the normal limit, Wexford provided Peppers with an inhaler from the third day of his detention on, and there is no evidence Peppers suffered from an asthma exacerbation or needed additional treatment during his detention. (PSOF Ex. C at 7–8.) Peppers has provided no reliable medical evidence that he suffered an asthma exacerbation in detention or that Wexford was deliberately indifferent to his asthma.

Based on the lack of reliable medical evidence to support any aspect of Peppers's claim, Wexford is entitled to summary judgment on the § 1983 claim for deliberate indifference. *See Franklin v. State of Or., State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981) ("A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." (citation omitted)). Peppers also raises a *Monell* claim against Wexford for its alleged policy not to give medication to an inmate even if a doctor has prescribed it. Because Peppers has not demonstrated an Eighth Amendment violation for deliberate indifference, as detailed *supra*, his dependent *Monell* claim also fails.

**IT IS THEREFORE ORDERED** granting Defendant Wexford Health Sources' Motion for Summary Judgment (Doc. 94).

**IT IS FURTHER ORDERED** granting Defendants Yavapai County, Sheriff Scott Mascher, Deputy Trevor Hearl, Sergeant Jarrod Winfrey, and Deputy Travis Hartman's Motion for Summary Judgment (Doc. 96).

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment in favor of Defendants and to close this matter.

Dated this 28th day of February, 2024.

_____
Honorable John J. Tuchi
United States District Judge